IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PERKIOMEN VALLEY SCHOOL DISTRICT    :
                                    :
            v.                      :     CIVIL ACTION NO. 18-3009
                                    :     (Consolidated with 18-3165)
R.B., in her own right, and by and through her :
Parents, K.A. & J.B.                :

## MEMORANDUM

**SURRICK, J.**                                    **APRIL 13, 2021**

Presently before the Court is Perkiomen Valley School District's Motion for Summary Judgment (ECF No. 11), and R.B., K.A., and J.B.'s Motion for Summary Judgment (ECF No. 13). For the following reasons, Perkiomen Valley School District's Motion will be denied and R.B., K.A., and J.B.'s Motion will be granted.

## I.    BACKGROUND

In this consolidated matter, K.A. and J.B. ("Parents"), individually, and on behalf of their daughter, R.B.[1], allege violations of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.* ("IDEA"), Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Rehabilitation Act" or "Section 504"), the Americans with Disabilities Act, 42 U.S.C. § 12132, *et seq.* ("ADA"), and related state and federal law. (ECF No. 1.) Parents contend that Perkiomen Valley School District ("School District") failed to offer R.B., a child with disabilities, a free appropriate public education ("FAPE") during her 2015-2016 and 2016-2017 school years.

Parents asserted these claims at the administrative level after unilaterally placing R.B. in a private program for both school years. On April 21, 2018, after a due process hearing that

---

[1] We refer to mother, K.A., and father, J.B., and their child, R.B., by their initials only.

spanned three sessions, a Pennsylvania Special Education Hearing Officer ("Hearing Officer")
concluded that the School District's proposed programs for R.B. for the 2015-2016 and 2016-
2017 school years were not reasonably calculated to provide R.B. with a FAPE.  The Hearing
Officer determined that Parents were entitled to tuition reimbursement for the private placement
in full for the 2015-2016 school year and 50% for the 2016-2017 school year, plus academic
costs.  The Hearing Officer did not direct School District to reimburse Parents for residential and
travel expenses.

Both Parents and School District argue that the Hearing Officer erred.  Parents contend
that they are entitled to tuition reimbursement for the private placement in full for the 2016-2017
school year and for residential and travel expenses incurred both school years.  School District
contends that it did provide a FAPE to R.B. for both school years, and that Parents are not
entitled to reimbursement for the private placement for either school year.  Both Parents and
School District seek attorneys' fees and costs of litigation.  School District and Parents now each
move for summary judgment.

A.     **Factual Background[2]**

Since before she was one year old, R.B. has been eligible for special education under the
IDEA, and she has been considered a protected handicapped student under Section 504 and
Pennsylvania Chapter 15.  (H.O.D. ¶¶ 1, 6.)  R.B. is classified as having an Intellectual Disability
and a Speech/Language Impairment.  (H.O.D. ¶ 1.)

Several oral surgical procedures have impacted R.B.'s physical ability to speak.  (H.O.D.

---

[2] Citations in this section will generally be to the Hearing Officer's Decision ("H.O.D."),
the notes of testimony from the administrative hearings ("Witness's last name, N.T."), Parents'
exhibits ("P-"), School District's exhibits ("S-"), and exhibits to the closing briefs parties
submitted to the Hearing Officer.

¶ 3.)  She also has cognitive deficits and brain abnormalities that affect her ability to process language and other information.  (*Id*.)  R.B. requires a lot of repetition to learn new skills and learns best visually and hands-on.  (S-21 at 7; K.A., N.T. 66.)  She has weaknesses with visual-motor integration.  (H.O.D. ¶ 3.)  R.B. is not able to control one side of her body as much as the other side.  (*Id*.)  She must avoid abdominal contact because of cysts on her pancreas and liver.  (S-2 at 7; P-1 at 6; P-18 at 11.)  R.B. will not be able to drive due to her disabilities.  (P-18 at 17; P-35 at 2; S-21 at 7; P-7 at 9; K.A., N.T. 66.)

R.B. has trouble with social skills, peer relationships, and emotional and behavioral functioning.  (H.O.D. ¶ 4.)  R.B. is particularly dependent on her family, especially her mother, due to her long history of medical issues and surgeries.  (Alter, N.T. 336; Powell-Mochler, N.T. 427.)  R.B.'s strengths in the educational setting include self-advocacy skills, oral language skills, timely completion of individual and group assignments, and forming and maintaining friendships.  (H.O.D. ¶ 5.)

Since the summer of 2008, R.B. has been a resident of the School District.  (*Id*. at ¶¶ 1, 6.)  The School District receives federal funding.  (*Id*. at ¶ 2.)

In the 2012-2013 school year, R.B. was sixteen years old and attended eleventh grade at School District's high school.  (H.O.D. ¶ 8; P-1 at 1.)  R.B. participated in the Montgomery County Intermediate Unit ("MCIU") career exploration program.  (P-1 at 12.)  In the 2013-2014 school year, R.B. was seventeen years old and attended twelfth grade at School District's high school.  (H.O.D. ¶ 10; P-7 at 1.)   During this school year, she participated in an internship program at an elementary school.  (H.O.D. ¶ 10; P-7 at 9; P-18 at 17.)  In the 2012-2013 and 2013-2014 school years, R.B. practiced academic, prevocational, communication, and independent living skills in the classroom at the high school.  (H.O.D. ¶ 11; P-1 at 16; P-7 at 13.)

R.B. also worked as an office aide in her high school and was a manager of the high school girls' soccer team.  (H.O.D. ¶ 11; Kristofco, N.T. 549-50, 576-77; S-1 at 2; P-3 at 4; P-7 at 9.)

R.B. received the following related services: group counseling services three times per month, group speech and language therapy one time per cycle, occupational therapy two sessions per month, and physical therapy one session per month during the 2012-2013 school year reduced to one session per marking period during the 2013-2014 school year. (P-1 at 33; P-7 at 26.)

   *1.  The 2014-2015 School Year*

In her thirteenth school year, R.B. was eighteen years old and had an eighth-grade reading level.  (S-2 at 1, 7-8; S-1 at 8.)  R.B. participated in the MCIU Apartment Program five days a week in the afternoon.  (H.O.D. ¶ 12; S-9 at 26-39.)  In the Apartment Program, she practiced various independent living skills in a simulated apartment setting.  (H.O.D. ¶ 12.)  R.B. performed some independent living skills successfully but required support at times.  (H.O.D. ¶ 12.)  The director of the Apartment program, Sally Bishop, recognized that R.B.'s strengths were persisting at difficult tasks, being pleasant and cooperative, and working well independently.  (S-2 at 14; S-9 at 26-39; P-13 at 1.)

This school year, R.B. practiced prevocational, communication, and independent living skills in the classroom at School District's high school.  (H.O.D. ¶ 11.)  R.B. also continued to work as an office aide in her high school.  (H.O.D. ¶ 11; Kristofco, N.T. 549-50, 577; S-2 at 7.)  R.B. continued to receive the same related services as she had previously.  (S-2 at 32-33.)

In the fall, Parents began exploring alternative programs that focused on independent living skills for R.B.'s 2015-2016 school year.  (H.O.D. ¶ 14.)  Parents discovered a New York residential transition program for students with intellectual disabilities, the Vocational

Independence Program ("VIP").  (*Id.* at ¶¶ 14, 76.)

Parents and R.B. attended an IEP[3] meeting on November 3, 2014, and Parents asked

School District to fund R.B.'s placement at VIP.  (S-2 at 3; H.O.D. ¶ 27.)  School District denied

the request.  (H.O.D. ¶ 27.)  R.B.'s November 2014 IEP identified the following post-secondary

goals in the transition section: a vocational independence-type program, part-time employment,

and living with others.  (*Id.* at ¶ 23.)  At the time, R.B. was weak in some independent living

activities, such as eating in a restaurant, using public transportation, managing finances, folding

laundry, and acquiring information about post-secondary programs.  (*Id.* at ¶ 20.)

In May of 2015, Parents notified School District that they believed R.B. was not ready to

graduate at the end of the 2014-2015 school year.  (H.O.D. ¶ 28.)  Parents believed R.B. needed

to acquire more independent living and vocational skills and determine areas of vocational

interest.  (*Id.*)  Parents retained Dr. Domenico Cavaiuolo, a professor of special education, to

author an independent transition evaluation report of R.B.  (*Id.* at ¶¶ 29-30.)  Dr. Cavaiuolo

based his report on observations, interviews, and some of R.B.'s education records.  (*Id.* at ¶ 30.)

In Dr. Cavaiuolo's opinion, VIP was appropriate for R.B.  (*Id.* at ¶ 31.)  Parents gave Dr.

Cavaiuolo's report to School District.  (*Id.*)  Parents told School District that R.B. had been

accepted by VIP and requested again that School District fund R.B.'s placement at VIP.  (*Id.*)

School District denied the request.  (*Id.* at ¶ 32.)  In late May or early June of 2015, Parents

arranged for R.B. to begin counseling with a private clinical psychologist, Dr. Patricia Powell-

Mochler.  (H.O.D. ¶ 48; Powell-Mochler, N.T. 419-23, 446.)

June 1, 2015, Parents attended an IEP meeting.  (H.O.D. ¶ 33.)  The IEP team, consisting

---

[3] An IEP is a written plan, created by a multi-disciplinary team, setting forth "the package of special educational and related services designed to meet the unique needs of the disabled child."  *Carlisle Area Sch. Dist. v. Scott P.*, 62 F.3d 520, 526 (3d Cir. 1995) (citation omitted).

of School District officials and Parents, agreed that R.B. was not ready to graduate and needed "additional programming." (P-18 at 15; S-11 at 2; P-22 at 2.) The transition section of the June 2015 IEP identified the following post-secondary goals: a vocational training program for work in childcare or technology, employment in the childcare field, and living with family or a roommate. (H.O.D. ¶ 37.) Identified transition needs included self-advocacy and social skills, such as interactions with peers and adults. (*Id*. at ¶ 34.) The IEP team determined that R.B. would focus on her functional skills, rather than her academic skills, in the 2015-2016 school year. (*Id*.)

School District proposed that R.B attend either the high school, the Technical College High School - Pickering Program's Early Childhood Education Program ("Pickering Program"), or another school age career preparation program for the 2015-2016 school year. (H.O.D. ¶¶ 38, 43; P-18 at 15-16; P-22 at 2.) School District offered R.B. the same related services she had received previously. (H.O.D. ¶ 41; P-18 at 36-37.)

School District also determined R.B. was eligible for Extended School Year ("ESY") services from July 6, 2015 to August 7, 2015, but R.B. was not able to attend an ESY program that summer because her family had planned vacations during that time period. (H.O.D. ¶ 44.)

A little over a week after the June 2015 IEP meeting, K.A. and R.B. toured the Pickering Program at School District's request. (K.A., N.T. 114-15; S-7 at 16; P-16.) After touring the Pickering Program, Parents had reservations about R.B. attending the Pickering Program because it would have only exposed R.B. to one vocation and it would not have addressed her independent living skills needs. (K.A., N.T. 114-15; P-16.)

In July of 2015, Parents again requested that School District fund R.B.'s placement at VIP. (H.O.D. ¶ 45.) School District refused. (*Id*.) After receiving School District's final

refusal, Parents decided to enroll R.B. in VIP for the 2015-2016 school year.  (*Id*. at ¶ 46.)  On

August 10, 2015, Parents notified School District of their decision.  (*Id*. at ¶ 47.)

        2.     *The 2015-2016 School Year*

        In her fourteenth school year, R.B. was nineteen years old and had an eighth grade

reading level.  (P-18 at 1, 9.)  In September of 2015, R.B. began attending VIP.  (H.O.D. ¶ 47.)

        During this school year, R.B. attended courses in Advanced Communication, Banking

and Budgeting, Civics, Computer, Executive Functioning Tools and Strategies, Health,

Introduction to Employment, Nutrition, Pre-College English, Social Psychology, and Travel

Training.  (*Id*. at ¶ 97.)  R.B. did not attend any courses for credit.  (*Id*. at ¶ 90.)  R.B.'s course

outcome assessments showed progress in all courses.  (*Id*. at ¶ 99.)  In the spring semester, R.B.

participated in an internship at an assisted living facility's recreational department, two to three

hours per day, twice a week.  (H.O.D. ¶ 98; Cavanagh, N.T.  261-62.)

        R.B. also met at least once per week with individual counselors in the areas of academics,

social functioning, independent living, and employment skills.  (*Id.* at 261-62.)  These counselors

were also available to R.B. for additional support as needed.  (*Id.* at 273.)  At VIP, R.B.

developed coping skills to better self-regulate her emotions.  (H.O.D. ¶ 103.)  R.B. also attended

weekly telephone sessions with Dr. Powell-Mochler.  (H.O.D. ¶¶ 48, 106; Powell-Mochler, N.T.

418, 424-29, 445.)

        R.B. lived at a residence hall with other students from VIP.  (Alter, N.T. 339, 352.)  Her

family visited her about once per month.  (P-48.)  Parents incurred expenses for R.B.'s tuition,

training, books, supplies, and travel.  (H.O.D. ¶¶ 104-05; P-48.)

        In the spring, Parents and representatives of VIP planned for R.B. to return to VIP for the

2016-2017 school year.  (H.O.D. ¶ 49.)  In June of 2016, Parents retained Dr. Cavaiuolo to

author a follow-up independent transition evaluation report of R.B.. (H.O.D. ¶ 50.) Again, in Dr. Cavaiuolo's opinion, VIP was appropriate for R.B. (*Id*.) Dr. Cavaiuolo also opined that the Pickering Program proposed by School District was deficient because it did not offer significant opportunities for hands-on experience in vocational training and because it lacked independent living skills instruction. (*Id*.) Parents gave School District a report of R.B.'s progress at VIP and a copy of Dr. Cavaiuolo's follow-up report. (H.O.D. ¶ 51; S-16; S-17; S-18 at 13; P-25; P-27.) Parents reminded School District of its obligation to provide a FAPE to R.B. for the 2016-2017 school year. (H.O.D. ¶ 51.)

Shortly afterward, School District scheduled an IEP meeting to discuss the 2016-2017 school year. (*Id*. at ¶ 52.) On July 19, 2016, Parents attended the IEP meeting. (K.A., N.T. 126.) The IEP noted that although R.B. had made progress with some functional skills at VIP, she had "not yet reached satisfactory." (S-18 at 12.) R.B.'s independent living skills needs were managing finances, travel instruction/transportation, and food preparation. (H.O.D. ¶ 53.) R.B.'s transition needs were self-advocacy and social skills like interactions with peers and adults. (*Id*. at ¶ 52.) For the 2016-2017 school year, School District proposed that R.B. attend either the high school full-time or the Pickering Program mornings and the Chester County Intermediate Unit ("CCIU") Discover Program afternoons. (H.O.D. ¶¶ 59-61; S-18 at 13, 48, 51; MacLuckie, N.T. 457, 462-63; Kristofco, N.T. 580-81.) R.B. was offered the same related services as she had received previously. (H.O.D. ¶ 57; S-18 at 28-29.) Parents asked School District to fund R.B.'s placement at VIP for the 2016-2017 school year, but School District refused. (*Id*. at 51-54.)

Following the IEP meeting, Parents gave School District permission to conduct a re-evaluation of R.B. (H.O.D. ¶ 64.) Although R.B. was available at home all summer for the re-

evaluation, the re-evaluation did not occur until the start of the 2016-2017 school year because School District evaluations are not conducted during the summer.  (P-34; S-19 at 3; H.O.D. ¶ 64.)

In mid-August 2016, Parents notified School District that R.B. would be returning to VIP for the 2016-2017 school year.  (H.O.D. ¶ 62.)

3.     *The 2016-2017 School Year*

In her fifteenth school year, R.B. was twenty years old.  (S-18 at 7.)  At VIP, R.B. attended courses in Advanced Communication, Advanced Travel Training, Banking and Budgeting, Executive Functioning Tools and Strategies II, Employment Strategies, Food and Nutrition, Literature, Media Applications, and Social Psychology II.  (H.O.D. ¶ 100.)  R.B. did not attend any courses for credit.  (*Id*. at ¶ 90.)  R.B.'s course outcome assessments showed progress in all courses.  (*Id*. at ¶ 102.)   R.B. also participated in internships at a retail store, in the fall, and a hospital, in the spring, for four to five hours per day, twice a week.  (H.O.D. ¶ 101; Cavanagh, N.T. 265.)

At least once per week, R.B. continued to receive individual counseling in academics, social functioning, independent living, and employment skills.  (*Id*. at 263.)  R.B. had minimal contact with Dr. Powell-Mochler during this school year because she was handling situations independently or with VIP staff.  (Powell-Mochler, N.T. 428-32, 440.)  R.B. was chosen to be a social ambassador for prospective students.  (Alter, N.T. 356.)  R.B. again lived at a residence hall with other students from VIP.  (*Id.* at 339, 352.)  Her family visited her about once per month.  (P-48.)  Parents again incurred expenses for R.B.'s tuition, training, books, supplies, and travel.  (H.O.D. ¶¶ 104-05; P-48.)

In October 2016, the School District's school psychologist, Michele Fultz, conducted

9

assessments and interviews for the re-evaluation of R.B..  (H.O.D. ¶ 64; P-33.)  R.B. was not

interviewed.[4]  (H.O.D. ¶ 64; K.A., N.T. 130.)   The School District issued the Re-evaluation

Report ("RR").  (H.O.D. ¶ 65.)  The RR concluded that resilience and self-advocacy were R.B.'s

strengths and communication, problem-solving, accepting criticism, and social thinking skills

were R.B.'s weaknesses.  (*Id.* at ¶ 67.)  It also concluded that there were clinical findings of

depression, somatization, and withdrawal, and that R.B. should be screened by her medical

doctor because R.B. falls and trips easily,[5]  has panic attacks, loses control when angry, bullies

others, and hurts others on purpose.  (S-21 at 33; H.O.D. ¶ 67.)  The RR recommended the

School District's July 2016 proposals.  (H.O.D. ¶ 70.)

Concerned about the RR's conclusions, Parents contacted R.B.'s VIP social counselor,

Christine Alter.  (P-36.)  Ms. Alter indicated that she did not agree with the RR because based on

her observations of R.B., R.B. was "thriving" at VIP.  (P-36; Alter, N.T. 335-47.)  December 2,

2016, VIP staff selected R.B. to be awarded student of the month.  (Alter, N.T. 356-58; P-37.)

---

[4] It is unclear why Ms. Fultz did not interview R.B., at least by telephone.  K.A. testified that Ms. Fultz attempted, unsuccessfully, to call R.B. only once.  (K.A., N.T. 130.)  Exhibits in the administrative record show that during her time at VIP, R.B. was in contact regularly with Dr. Powell-Mochler and Parents by phone,  (Powell-Mochler, N.T. 418, 424, 445; J.B., N.T. 220-21), and that one of R.B.'s strengths is using her iPhone.  (S-1 at 3; P-11.)  Ms. Fultz did not testify before the Hearing Officer.

[5] We note that this behavior was not documented when R.B. attended programming at the School District's high school, even though Parents were to be notified immediately of any falls.  Due to R.B.'s cysts on her pancreas and liver, R.B.'s IEPs reflected that Parents must be "notified as soon as possible if [R.B.] sustains a significant/hard fall."  (S-2 at 32; P-1 at 6; P-18 at 11.)  The administrative record contains indications that R.B.'s ambulation was satisfactory.  R.B.'s School District physical therapist reported that R.B. was able to "ambulate throughout the school setting and outdoors on school grounds. . . . [She] can jump off a 4 inch step and hop on her right or left foot 3x, gallop, and run."  (S-2 at 12.)  The School District had even reduced R.B.'s physical therapy to once per marking period in 2013.  (P-7 at 26.)  School District had also permitted R.B. to walk to the elementary school every day for her internship during the 2013-2014 school year.  (P-18 at 17; Kristofco, N.T. 554.)

December 16, 2016, Parents attended another IEP meeting.  (H.O.D. ¶ 71.)  School District again proposed that R.B. attend the Pickering program mornings and the Discover Program afternoons for the remainder of the school year.  (H.O.D. ¶¶ 72-74; S-22 at 8, 36.)  The only change from the prior IEP was the addition of a speech/language (articulation) goal.  (H.O.D. ¶ 72.)  School District refused to fund R.B.'s placement at VIP for the remainder of the 2016-2017 school year.  (S-22 at 36-39.)   At that juncture, Parents feared that pulling R.B. out of VIP half-way through the school year would have been detrimental to R.B..  (K.A., N.T. 133.)  R.B. remained at VIP until the end of the 2016-2017 school year. (H.O.D. ¶¶ 101-02.)  R.B. turned twenty-one by the end of the 2016-2017 school year and aged out of special education.  (S-22 at 31; S-18 at 29.)

4.    *The 2017-2018 School Year*

R.B. attended VIP for her third and final year of the program.  (K.A., N.T. 134, 163.)  R.B. took classes in executive functioning, social functioning, independent living skills, and employment skills, with one-on-one counseling in all areas at least once per week.  (Cavanagh, N.T. 261-62.)  R.B. participated in internships three days a week for five to seven hours per day.  (*Id.*)

**B.    Hearing and Decision**

At the administrative hearing, which took place over three sessions, the following witnesses testified: on December 15, 2017, K.A., Dr. Cavaiuolo, and J.B.; on January 26, 2018, Dr. Paul Cavanagh[6] and Ms. Alter; and on January 29, 2018, Dr. Powell-Mochler, Michelle

---

[6] Senior Director of VIP during the relevant time period and R.B.'s first-year Executive Functioning professor.  (Cavanagh, N.T. 235-36, 255.)

MacLuckie[7], Maria DeLuca[8], and Ms. Kristofco.

The Hearing Officer determined that the testifying witnesses were "generally credible. . . [and] appeared to provide an account of relevant events to the best of his or her recollection." (H.O.D. 15.)

With respect to Dr. Cavaiuolo, the Hearing Officer determined that he "was persuasive with respect to post-secondary transition planning opportunities for students with significant disabilities, including [R.B.]; however, his proffered opinion on the [School] District's proposed program for [R.B.] was accorded limited weight because it did not appear to be based on a thorough understanding of what was previously provided or offered . . . [and] this witness candidly conceded that he considered whether [VIP] was and is 'more' or 'most appropriate' for [R.B.] in comparison to the [School] District's proposal, which as noted below is not the standard." (*Id.* at 15.) (citations omitted).

The Hearing Officer determined that Parents had established that School District's proposed programs for the 2015-2016 and 2016-2017 school years "were not appropriate for [R.B.] in terms of individualized, outcome-oriented post-secondary transition programming." (*Id.* at 23.)  The Hearing Officer also determined that VIP was appropriate for R.B.  (*Id.* at 25.)

Upon considering the equities, the Hearing Officer had no equitable concerns for the 2015-2016 school year, but the Hearing Officer did have equitable concerns that Parents did not intend to accept School District's July 2016 proposal.  (*Id.* at 26.)  Accordingly, the Hearing Officer ordered the School District "reimburse the Parents only for tuition and related academic costs (training, books, and supplies) for the 2015-16 (at 100%) and 2016-17 (at 50%) school

---

[7] Supervisor of the CCIU.  (MacLuckie, N.T. 447.)

[8] Assistant Director of Student Services at the MCIU.  (DeLuca, N.T. 509.)

12

years." (*Id.* at 27.)  Regarding R.B.'s residential and travel expenses at VIP, according to the

Hearing Officer, equitable considerations dictated that School District was not required to

reimburse Parents.  (*Id.*)

## II.   LEGAL STANDARD

We review the decision of a Special Education Hearing Officer pursuant to the IDEA

under "a nontraditional standard of review, sometimes referred to as 'modified *de novo*' review."

*D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010) (citations omitted).  A district

court reviewing an IDEA decision must make its own findings by a preponderance of the

evidence.  20 U.S.C.A. § 1415(i)(2)(C)(iii).  However, we must give "due weight" to the Hearing

Officer's findings.  *Bd. of Educ. of Hendrick Hudson Central Sch. Dist., Westchester Cty. v.

Rowley*, 458 U.S. 176, 206 (1982).  We consider the Hearing Officer's factual findings to be

"prima facie correct," and although we are free to accept or reject these findings, we must

explain our reasons if we decline to accept them.  *S.H. v. State-Operated Sch. Dist. of City of

Newark*, 336 F.3d 260, 271 (3d Cir. 2003).    When analyzing any live testimony delivered by

witnesses before the Hearing Officer, we give "special weight" to the Hearing Officer's

credibility determinations.  *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194,

199 (3d Cir. 2004*)*.  We must accept the Hearing Officer's credibility determinations, "unless

non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless

the record read in its entirety would compel a contrary conclusion."  *Carlisle*, 62 F.3d at 529.  In

this context, the word "justify" requires essentially the same standard of review given to a trial

court's findings of fact by a federal appellate court.  *Shore Reg'l*, 381 F.3d at 199 (citation

omitted).

Also, we are not "to substitute [our] own notions of sound educational policy for those of

13

local school authorities*." State-Operated Sch. Dist. of Newark*, 336 F.3d at 270 (quoting *MM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 531 (4th Cir. 2002)).  "When schools use their expertise to address each child's distinct educational needs, we must give their judgments appropriate deference*." Dunn v. Downingtown Area Sch. Dist. (In re K.D.)*, 904 F.3d 248, 250 (3d Cir. 2018).

Claims for "tuition reimbursement are subject to plenary review as conclusions of law. . . . [W]hether the District fulfilled its FAPE obligations—[is] subject to clear error review as [a] question[] of fact." *P.P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009).  "[T]he party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged." *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012).

"The process of adjudicating cross motions for judgment on the administrative record in IDEA cases is not a 'true summary judgment procedure,' but rather is effectively a 'bench trial on a stipulated record.'" *David G. v. Council Rock Sch. Dist.*, No. 06-1523, 2012 U.S. Dist. LEXIS 51427, at *4 (E.D. Pa. Apr. 10, 2012) (quoting *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993)).

## III.   DISCUSSION

### A.   IDEA

"The Individuals with Disabilities Education Act (IDEA or Act) offers States federal funds to assist in educating children with disabilities." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017).  In exchange for the federal funds, States "must provide a free appropriate public education—a FAPE, for short—to all eligible children." *Id.*  Eligible children are "[a]ll children with disabilities residing in the State, including children with disabilities who are homeless children or are wards of the State and children with disabilities attending private

14

schools, regardless of the severity of their disabilities, and who are in need of special education and related services." 20 U.S.C.A. § 1412(a)(3)(A). Eligible children are entitled to "receive at public expense specially designed instruction to meet [their] unique needs, as well as related transportation." *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 361 (1985).

"A cost-benefit philosophy" underlies the origins of the IDEA. *Kruelle v. New Castle County School District*, 642 F.2d 687, 691 (3d Cir. 1981). "Instead of saddling public agencies and taxpayers with the enormous expenditures necessary to maintain the handicapped as lifelong dependents in a minimally acceptable institutionalized existence, Congress reasoned that the early injection of federal money and provision of educational services would remove this burden by creating productive citizens." *Id*. "[A] key concern of and primary justification for the [IDEA] lay in the important goal of fostering self-sufficiency in handicapped children." *Polk v. Cent. Susquehanna Intermediate Unit 16*, 853 F.2d 171, 181 (3d Cir. 1988). "A chief selling point of the Act was that although it is penny dear, it is pound wise -- the expensive individualized assistance early in life, geared toward teaching basic life skills and self-sufficiency, eventually redounds to the benefit of the public fisc as these children grow to become productive citizens." *Id.* at 181-82.

"Under the IDEA, a school district's obligations to provide and a student's right to receive a FAPE both terminate when the child reaches the age of twenty-one." *Ferren C. v. Sch. Dist. of Phila.*, 612 F.3d 712, 717 (3d Cir. 2010) (citing 20 U.S.C.A. § 1412(a)(1)(A)). "A FAPE 'consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction.'" *Ridley Sch. Dist.*, 680 F.3d at 268-69 (quoting *Rowley*, 458 U.S. at 188-89). An "individualized education program" ("IEP") is a "detailed written statement arrived at

by a multi-disciplinary team specifying the services, including specially designed instruction, that the child will receive." *Id.* at 274 (citing *Polk*, 853 F.2d at 173).

"[P]arents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement." *Burlington*, 471 U.S. at 370. "[P]arents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk." *Id.* at 373-74. "Parents are entitled to tuition reimbursement under the IDEA for unilaterally changing their child's placement to a private school if the following three elements are proven: (1) the District failed to offer the student a FAPE; (2) the private placement is appropriate; and (3) equitable considerations favor reimbursement." *Lauren G. v. West Chester Area Sch. Dist.*, 906 F. Supp. 2d 375, 390 (E.D. Pa. 2012) (citing *Florence Cnty Sch. Dist. Four v. Carter*, 510 U.S. 7, 15-16 (1993)); *see also* 20 U.S.C.A. § 1412(a)(10)(C)(ii); 34 C.F.R. 300.148(c).

**B.      Whether the School District Offered a FAPE to R.B.**

We must "assess the appropriateness of an IEP on a case-by-case basis, taking into account the available research," *Ridley Sch. Dist.*, 680 F.3d at 279, and "the unique circumstances of the child for whom it was created." *Endrew F.*, 137 S. Ct. at 1001. The Third Circuit's "longstanding" test requires a school to provide eligible students with "an educational program 'likely to produce progress, not regression or trivial educational advancement.'" *Dunn*, 904 F. 3d at 254 (quoting *Ridley Sch. Dist.*, 680 F. 3d at 269)). The benefit to the student must be more than *de minimis*. *M.C. v. Central Regional Sch. Dist.*, 81 F.3d 389, 393 (3d Cir. 1996).

An IEP must be "'reasonably calculated' to enable [the child] to achieve meaningful educational benefits in light of [the child's] intellectual potential and individual abilities." *Ridley*

*Sch. Dist.*, 680 F.3d at 279 (quoting *Rowley*, 458 U.S. at 207).  "Although the IEP must provide

the student with a 'basic floor of opportunity,' it does not have to provide 'the optimal level of

services,' or incorporate every program requested by the child's parents."  *Id.* at 269 (quoting

*D.S.*, 602 F.3d at 557 (citations omitted)).  "IEPS must be reasonable, not ideal" and "[w]e may

not rely on hindsight to second-guess an educational program that was reasonable at the time."

*Dunn*, 904 F. 3d at 255.

"For children receiving instruction in the regular classroom, this would generally require

an IEP 'reasonably calculated to enable the child to achieve passing marks and advance from

grade to grade.'"  *Endrew F.*, 137 S. Ct. at 996 (quoting *Rowley*, 458 U.S. at 204).  With respect

to a child "not fully integrated in the regular classroom and not able to achieve on grade level,"

the child's "educational program must be appropriately ambitious in light of [the child's]

circumstances."  *Id.* at 1000.  "While courts can expect fully integrated students to advance with

their grades, they cannot necessarily expect the same of less-integrated students."  *Dunn*, 904

F.3d at 255.  "The goals may differ, but every child should have the chance to meet challenging

objectives."  *Endrew F.*, 137 S. Ct. at 1000.  "A reviewing court may fairly expect [school]

authorities to be able to offer a cogent and responsive explanation for their decisions that shows

the IEP is reasonably calculated to enable the child to make progress appropriate in light of [the

child's] circumstances."  *Id.* at 1002.

For a child that is age sixteen[9] or older, the IDEA requires that IEPs must include

appropriate measurable post-secondary goals based on age-appropriate transition assessments

related to training, education, employment, and independent living skills, as well as

---

[9] Under Pennsylvania law, IEPs must include transition planning for a child that is age
fourteen or older.  22 Pa. Code § 14.131(a)(5).

corresponding transition services. 20 U.S.C.A. § 1414(d)(1)(A) (VIII); 34 C.F.R. § 300.320(b).

Transition services are a "coordinated set of activities . . . designed to be within a result-oriented

process" that is based on the child's needs and interests and created to help the child transition

from school to post-school activities, such as vocational training, integrated employment,

community participation, and independent living.  20 U.S.C.A. § 1401(34)(B); 34 C.F.R. §

300.43.

"The Third Circuit has not defined what amount of transition planning is required in an

IEP to ensure FAPE." *Rogers v. Hempfield Sch. Dist.*, No. 17-1464, 2018 U.S. Dist. LEXIS

166109, at *15 (E.D. Pa. Sep. 27, 2018); *see also High v. Exeter Twp. Sch. Dist.*, No. 09-2202,

2010 U.S. Dist. LEXIS 7965 (E.D. Pa. 2010); *Sinan L. v. Sch. Dist. Of Phila.*, No. 06-1342, 2007

U.S. Dist. LEXIS 47665 (E.D. Pa. 2007).  "While a school district must provide opportunities for

a disabled student to build independent living skills and explore a post-secondary educational or

vocational plan, courts in the Third Circuit have emphasized that these requirements are un

demanding and are focused more on exposure to opportunities than a promise of a particular

outcome." *Coleman v. Pottstown Sch. Dist.*, 983 F. Supp. 2d 543, 574 (E.D. Pa. 2013).

School District argues that the "Hearing Officer erred in applying a standard in

considering the appropriateness of the transitioning program that does not exist." (School

District Mot. 9.)  School District is mistaken.  The Hearing Officer's standard of review of the

School District's IEPs was consistent with 20 U.S.C.A. § 1401(34) and the Supreme Court's

guidance in *Endrew F.*.  (H.O.D. 16-19.)  The Hearing Officer also correctly concluded that

Third Circuit decisions are consistent with *Endrew F.*  (H.O.D. 17).  *See Dunn*, 904 F.3d at 254.

For these reasons, we will apply the usual deference to the Hearing Officer's decision.

We also agree with the Hearing Officer that the standard applied by Dr. Cavaiuolo was

not consistent with the law.  (H.O.D. 15.)  Dr. Cavaiuolo formed opinions of what would be

"more appropriate" or the "most appropriate" placement for R.B. rather than what would be an

"appropriate" placement for R.B.  (Dr. Cavaiuolo, N.T. 186-87; P-51 at 21.)  Our conclusions

regarding the appropriateness of School District's proposed IEPs and VIP are not based on the

ultimate opinions of Dr. Cavaiuolo.

> *1.      The 2015-2016 School Year*

The School District offered the following three options as R.B.'s placement for the 2015-

2016 school year:  (1) the Pickering Program; (2)  vocational, academic, and independent daily

living instruction full-time at the high school; or (3) assistance finding an alternate school-age

program.  The District also offered the following three options as R.B.'s ESY placement for the

summer of 2015: (1) MCCC's Bridge to College program; (2) MCIU's Compass Program; or (3)

Perkiomen Valley Middle School-East Program.

We agree with the Hearing Officer that the proposed programs for the 2015-2016 school

year would not have offered R.B. a FAPE.  These programs were not likely to confer meaningful

benefit to R.B..  Each proposed program will be addressed in turn.

In the Pickering Program, for about two hours each day, students develop skills in

working with children, such as safety, record keeping, the value of play, and supporting play.

(MacLuckie, N.T. 461, 470-71.)  This program can culminate in the student earning a

certification; however, it need not.  (H.O.D. ¶ 39; MacLuckie, N.T. 468.)  R.B. would not have

been expected to earn certification.  (H.O.D. ¶ 39.)  A case manager is assigned to each student

to provide support and modifications as needed.  (MacLuckie, N.T. 464.)  There is also a

learning support teacher and an instructional assistant available to assist students individually.

(*Id*.)  Two mental health therapists are also available.  (*Id.* at 465-66.)  It is a vocational-technical

regular education program, not a community-based instruction program.  (H.O.D. ¶ 38.)

There is a dispute over whether School District offered Parents the Pickering Program. The Hearing Officer determined that the Pickering Program was offered.  (*Id.* at ¶¶ 38-39.)  The record supports that conclusion.  The June 2015 IEP and Notice of Recommended Educational Placement ("NOREP") and the July 2015 NOREP refer to the Pickering Program.  (P-18 at 15-16; P-22 at 2; S-11 at 2.)

In any event, the Pickering Program was not appropriate for R.B..  It would have only exposed R.B. to one vocation, childcare.  However, it was not certain that R.B.'s future vocation would be childcare.  R.B.'s interests had shifted from childcare to computers and eldercare, and, according to Ms. Kristofco, "[a]t times [R.B.] has expressed interest working with kids, but I don't think she is really sure, I don't think she has found out what she wants to do yet."  (P-51 at 4-5).  Further, the Pickering Program would not have provided R.B. with adequate instruction in transportation and independent living skills.  Strengthening transportation and independent living skills was important for R.B. because one of R.B.'s post-secondary goals was living independently with a roommate and R.B.'s post-secondary life will likely involve public transportation as R.B. is not eligible for a driver's license.

At the high school, it was proposed that R.B. receive instruction in academics and vocational skills and awareness with part-time on-the-job training in an area of interest.  (H.O.D. ¶ 43; P-18 at 16.)  No additional information has been provided about this proposed option.  Full-time learning support at the high school would not have been appropriate for R.B. because R.B. had already attended classroom instruction on independent living skills and experienced the simulated Apartment program.  Also, this proposal only vaguely described a vocational component.  Without more, we cannot assess the appropriateness of the vocational component.

No information has been provided about any alternate school age career preparation programs. Therefore, we cannot evaluate the appropriateness of these programs.

The MCCC Bridge to College Program offered instruction and practice in social skills, organization, self-advocacy, stress management, and time management in a college setting. (P-18 at 15.) As articulated by R.B.'s father at the Special Education Hearing, the Bridge to College Program was not appropriate for R.B. because it was a program for preparing students for college and R.B. would not likely be capable of doing college level course work and R.B. had no demonstrated interest in attending college. (J.B., N.T. 219.) At the time, R.B. had an eighth-grade reading level, and R.B.'s post-secondary goals were attending a vocational training program, living in an apartment with a roommate and working part-time, not attending college.

The MCIU Compass Program offered instruction on decision-making skills for independent living and work experience, travel training, self-advocacy, work-based social skills, and vocational exploration. (P-18 at 15; P-19 at 45.) The Compass Program is held four days a week, five hours each day. (P-19 at 45.) The Compass Program would not have been appropriate for R.B. because any educational benefit would have been *de minimis*. R.B. had already acquired simulated independent living skills in the Apartment Program and she had already received instruction on independent living skills in Ms. Kristofco's classroom.

No information has been provided as to what the Perkiomen Valley Middle School – East Program would have offered R.B. Therefore, we cannot assess the appropriateness of the Perkiomen Valley Middle School-East ESY Program.

### 2. *The 2016-2017 School Year*

For the 2016-2017 school year, the School District proposed that R.B. attend either the high school full-time or the Pickering Program in the morning and the CCIU Discover Program

in the afternoon.

We agree with the Hearing Officer that the proposed IEP for the 2016-2017 school year would not have offered R.B. a FAPE.  These programs were not likely to confer meaningful benefit to R.B.  Each proposed program will be addressed in turn.

We need not repeat our reasoning as to the inappropriateness of the high school and the Pickering Program.  However, we will add that the Pickering Program was now even more inappropriate for R.B. who no longer had an interest in childcare.

The Discover Program is a community-based vocational program that provides students with work opportunities in the community.  (H.O.D. ¶ 59; S-18 at 48).  Examples of work opportunities include preschools, Head Start programs, daycares, the SPCA, local veterinary hospitals and offices, and homes for the elderly.  (MacLuckie, N.T. 473-74.)  Students are not initially guaranteed a work opportunity in their field of interest, but over time the Discover Program attempts to place students at work sites that coincide with their interests.  (H.O.D. ¶ 60; MacLuckie, N.T. 458.)  Trying out different placements helps students discover which jobs fit their needs and skills.  (MacLuckie, N.T. 460.)  The Discover Program provides two levels of support: a vocational specialist who selects the work placement according to student's needs; and a job coach, who is either present on the job site or checking in periodically throughout the week, depending on the student's needs.  (*Id.* at 458.)  The Discover Program focuses primarily on development of prevocational, soft skills.  (H.O.D. ¶ 60.)

There is a dispute over whether School District offered Parents the Discover Program.  The Hearing Officer determined that the Discover Program was offered.  (*Id.* at ¶¶ 59-61.)  The record supports that conclusion.  The July 2016 IEP and NOREP, the December 2016 IEP, and the January 2017 NOREP refer to the Discover Program.  (S-18 at 13, 48, 51; S-22 at 8, 36.)

22

Also, Michelle MacLuckie and Amanda Kristofco testified that the Discover program was offered.  (MacLuckie, N.T. 457; Kristofco N.T. 580-81.)

In any event, the Discover Program would not have provided R.B. with a FAPE because it did not offer R.B. an opportunity to learn independent living skills.  Moreover, we agree with the Hearing Officer that although the addition of the Discover Program to the July 2016 IEP and December 2016 IEP was "an improvement to some degree over the June 2015 IEP, unfortunately [it] would serve only to return [R.B.] to practicing general employment skills, or prevocational, soft skills, something that [R.B.] had already experienced for a number of years prior to July 2016."  (H.O.D. 22-23.)

Although only the Discover program was proposed by the School District, the CCIU offered several other community-based instruction programs for post-secondary transition. (H.O.D. ¶ 75; S-18 at 35-50.)  These other programs offered opportunities for students to dine in a college cafeteria, stay on campus, explore vocations, develop public transportation and independent living skills, and even earn college credit.  (H.O.D. ¶ 75; S-18 at 36-50.)  The School District has not offered an explanation for its decision to not offer these other programs to R.B..  It is unclear why School District did not offer any of CCIU's other community-based instruction programs that might have addressed R.B.'s independent living skills needs.[10]

### C.    Whether VIP was an Appropriate Private Placement for R.B.

The School District argues that VIP was not appropriate because it is a post-secondary program and the IDEA does not permit relief for post-secondary programming.  In support of this argument, School District cites to the C.F.R. that a secondary school "does not include any

---

[10] Having determined that School District's proposed IEPs for the 2015-2016 and 2016-2017 school years were not appropriate for R.B., we agree with the Hearing Officer that we need not address Parents' procedural arguments.  (H.O.D. 23 n.7.)

education beyond grade 12," 34 C.F.R. § 300.36, and notes a number of details about VIP that are college-like, as well as its accreditation by the U.S. Department of Education as a Comprehensive Transition and Post-Secondary Program.  Also, even if VIP is not a post-secondary program, School District argues that there is no evidence that VIP was appropriate for R.B. because it did not provide speech and language therapy, IEP support, individualized direct instructions, and appropriate counseling services.  The School District is mistaken.

To be appropriate under the IDEA, the private school placement need not be perfect. *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 249 n.8 (3d Cir. 1999).  It also need not provide an IEP, meet state educational standards, or be approved of by the state.  *Florence County Sch. Dist. Four*, 510 U.S. at 14-15; *see also* 34 C.F.R. 300.148(c).  Rather, "it [must] provide[] significant learning and confer[] meaningful benefit, and [it must be] provided in the least restrictive educational environment."  *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 276 (3d Cir. 2007*)* (citation and internal quotation marks omitted).

We agree with the Hearing Officer's conclusion as to the appropriateness of VIP for R.B..[11]  Under all the circumstances, VIP was an appropriate private placement for R.B. because it was likely to confer meaningful benefit to R.B..

First, VIP is an educational program.  The record overwhelming supports this contention as there were educators on site, the curriculum provided educational services, and it is accredited by the U.S. Department of Education.  *Compare with Mary Courtney T. v. Sch. Dist.*, 575 F.3d 235, 246 (3d Cir. 2009) (finding that private placement was not an appropriate placement because there were no educators on site, no educational services, and the placement had no state

---

[11] We note that our review of VIP as an appropriate placement under IDEA is a matter of first impression in our Circuit, as well as any federal or state court.

educational accreditation.)

Next, we agree with the Hearing Officer that, although there are aspects of VIP that are "somewhat similar to college enrollment," it is *both* a transition program *and* a post-secondary program.  (H.O.D. 24.)  The Hearing Officer correctly concluded that for R.B., VIP was a transition program.  (*Id.*)  VIP's affiliation with a university and location on a college campus are not dispositive because even one of School District's proposed programs was affiliated with and located on a college campus.  Also, in the 2014-2015 school year, School District arranged for R.B. to attend the day-long workshop on interviewing, appropriate work attire, and careers at Montgomery County Community *College*.

We turn to the application process for VIP.  R.B. was not required to have a high school diploma or take any college admissions examinations to apply to VIP.  Further, the application process to VIP is separate from the application process to the local university.

We turn to the role, if any, of IEPs at VIP.  Christine Alter testified that VIP implements IEPs for some students.  (Alter, N.T. 393.)   Further, Dr. Cavanagh testified that during the 2015-2016 and 2016-2017 school years, about four to six students' educations at VIP were funded by their respective school districts.  (Cavanagh, N.T. 248.)  Turning to the VIP website, we note that although it offers charts on the differences between college and high school and secondary and post-secondary education, these charts are not necessarily for a student like R.B. who was enrolled in the non-credit vocational program and not the Associates Degree program.  (District's Closing Brief, Exs. C & D.)

Finally, we turn to R.B.'s curriculum at VIP.  We note initially that the local university is not involved in the curriculum or selection of textbooks at VIP, and that R.B. did not take any classes for credit through the local university.  (Cavanagh, N.T.  287-88.)  As noted by the

Hearing Officer, R.B.'s community-based work experiences and weekly courses and counseling in executive functional skills, travel training, independent living skills, and vocational skills all support a finding that VIP is indeed a transition program.

Satisfied that VIP is a transition program under IDEA, we now address whether VIP was appropriate for R.B.'s unique needs and interests.

We note initially that VIP admissions decisionmakers determined that VIP was appropriate for R.B. when they accepted her application. VIP only accepts students with certain intellectual disabilities who it believes are also capable of participating in the program. Students must have enough self-regulation skills to be safe in the VIP environment. Further, R.B.'s Apartment Program director, Sally Bishop, sent a letter to VIP, "highly" recommending R.B. for VIP. (P-13 at 1.)

Next, evidence in the record by those who observed or interacted with R.B. at VIP supports the finding that the VIP addressed R.B.'s unique needs and interests. Dr. Cavanagh, testified that VIP was appropriate for R.B. in light of her needs and that she had performed "extraordinarily well." (Cavanagh, N.T. 255-56, 276, 307.) Ms. Alter testified that the RR's conclusions that R.B. was depressed at VIP were in direct contrast to what she was observing of R.B. at VIP. (*Id.* at 360.) Ms. Alter's testimony is consistent with a letter she wrote to Parents, in response to the RR, wherein she stated that R.B. "has made clinically significant progress in all areas and experienced much success, especially with emotional management. . . . [R.B.] benefits from our milieu environment, providing her with many opportunities to practice her communication and relationship building skills." (P-36.) Dr. Powell-Mochler observed that R.B. requested less therapy sessions and relied on her mother less as time went on. (Powell-Mochler, N.T. 424, 427, 431-32, 440.) According to Dr. Powell-Mochler, "one of the beauties

26

of the program is that she had to learn to become more independent and less dependent upon her mother. That was how she was going to grow and mature." (*Id.* at 428.)  Powell-Mochler also observed that R.B. showed growth in her behavior, interactions with students and family, and understanding other people's perspectives and challenges.  (*Id.* at 430.)

The testimonies of Dr. Cavanagh, Ms. Alter, and Dr. Powell-Mochler support the statements of Parents that VIP addressed R.B.'s needs and interests, provided appropriate support, R.B. was capable of attending VIP, and that R.B. meaningfully benefited from VIP. (K.A., N.T. 62-66; J.B., N.T. 220-21.)

R.B.'s many accomplishments at VIP are also telling.  VIP staff selected R.B. to be student of the month during the fall semester of her second year.  To be selected student of the month, a student must exceed VIP expectations, have perfect attendance, and be in good standing.  (P-37.)  In Ms. Alter's letter to Parents, advising them of R.B.'s recent award, she wrote, "[R.B.] has consistently presented her best in the dorms, at work and in the classroom. She has demonstrated much effort in the areas of social skills, academic accountability and presenting her best.  You should be very proud of her progress." (*Id.*)  R.B. was also selected to be a student ambassador for prospective students her second year.  In addition, R.B.'s course outcome assessments showed progress in all courses at VIP both school years.  It is also significant that R.B. elected to attend VIP for a third year, even after she had aged out of special education.

Although R.B. had disabilities and was incredibly dependent on her family, she had the potential, through an appropriate education, to learn how to live independently.  Becoming independent from her family, in particular her mother, and learning how to live successfully with non-family members were challenging objectives for R.B..  Pursuing these challenging

objectives could empower her to achieve her post-secondary goals of working and living in an apartment with a roommate.  VIP provided appropriate support to R.B. along her journey toward independence in the form of individual counseling, functional and academic lessons, job coaches, and trained residential advisers.  As time went on, R.B. relied on these supports less and learned to handle situations on her own by integrating VIP's teachings into her daily life.  In the words of Ms. Alter, "R.B. entered our program very reliant upon her family, for support in all areas.  Over time [R.B.] has become a young woman who will self-advocate and utilizes the various supports we have at VIP, to ensure her needs are met. . . .  By living in our residential program, [R.B.] is gaining confidence in her ability to manage daily problems and attend to responsibilities more independently.  She has learned to be more proactive and self-aware."  (P-36.)  It bears repeating that the purpose of public funded special education is to create productive citizens rather than lifelong dependents.

With regard to the School District's argument that IDEA does not cover education beyond R.B.'s completion of twelfth grade, this argument is misplaced as School District agreed that R.B. required additional programming for the 2015-2016 and 2016-2017 school years to prepare her for post-secondary life.  School District acknowledged R.B.'s need for instruction and exposure to independent living and vocational skills by including her in the Apartment Program and the MCIU career exploration programs.  School District acknowledged R.B.'s continued need for further instruction and exposure in these areas by recommending the Bridge to College Program, Compass Program, Pickering Program, and Discover Program.

### D.  Whether the Equities Favor Reimbursement

In fashioning appropriate equitable relief, we have "broad discretion."  *Burlington*, 471

28

U.S. at 369.[12]  Factors to consider include "the appropriate and reasonable level of reimbursement that should be required.  Total reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable." *Florence County Sch. Dist. Four*, 510 U.S. at 16-17.  The Hearing Officer did not find the cost of tuition at VIP unreasonable and we see no reason to differ, considering the services and education R.B. received as a student there.

However, a reimbursement award may be reduced or denied:

> (I) if-
>> (aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or
>>
>> (bb) 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa);
>
> (II) if, prior to the parents' removal of the child from the public school, the public agency informed the parents, through the notice requirements described in section 1415(b)(3) of this title, of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the parents did not make the child available for such evaluation; or

---

[12] R.B. also asserted claims under the Rehabilitation Act and ADA.  Having found that School District's 2015-2016 and 2016-2017 proposed IEPs did not offer R.B. a FAPE, we also conclude that R.B. has established violations of the Rehabilitation Act and ADA.  However, from the briefing, it is apparent that Parents have abandoned attempts to recover damages under these statutes.  "[C]laims for compensatory damages under § 504 of the [Rehabilitation Act] and § 202 of the ADA also require a finding of intentional discrimination." *S.H. v. Lower Merion Sch. Dist.*, 729 F.3d 248, 261 (3d Cir. 2013).  "[D]eliberate indifference satisfies the requisite showing of intentional discrimination." *Id.* at 262.  Parents have not specifically briefed a claim for compensatory damages under § 504 and the ADA, and Parents have not argued explicitly how School District was deliberately indifferent.  In any event, we do not see any deliberate indifference in the record.

(III) upon a judicial finding of unreasonableness with respect to actions
taken by the parents.

20 U.S.C.A. § 1412(a)(10)(C)(iii).  "The IDEA was not intended to fund private school tuition

for the children of parents who have not first given the public school a good faith opportunity to

meet its obligations."  *C.H.*, 606 F.3d at 72.  Courts have denied or reduced reimbursement when

the parents failed to satisfy their "obligation to cooperate and assist in the formulation of an IEP,

and failed to timely notify the District of [their] intent to seek private school tuition

reimbursement."  *Id.*; *see also, L.M. v. Downingtown Area Sch. Dist.*, No. 12-CV-5547, 2015

U.S. Dist. LEXIS 49336, at *70 (E.D. Pa. Apr. 15, 2015) (finding that equitable considerations

weighed against reimbursing parents because "there is no evidence in the record that [parents]

seriously entertained accepting [District's] proposed program and placement."); *W.D. v.

Watchung Hills Reg'l High Sch. Bd. of Educ.*, 602 F. App'x 563, 568 (3d Cir. 2015) (concluding

that district court did not err in dismissing parent's reimbursement claim because parent had

signed an enrollment agreement and paid tuition to the private school weeks before the IEP

meeting, parent did not tour the school district's proposed program, and parent notified school

district at the IEP meeting that student was already attending orientation at the private

placement).

    Therefore, in fashioning equitable relief, it is proper to consider the actions of Parents.

Each school year will be addressed in turn.

    *1.     The 2015-2016 school year*

    We agree with Hearing Officer's conclusion that Parents meaningfully participated in

developing an IEP for the 2015-2016 school year.  The record reveals that Parents' actions were

overall reasonable.  Although Parents ultimately determined that the Pickering Program was not

appropriate for R.B., it is noteworthy that Parents and R.B. did tour this program shortly after the

June 2015 IEP meeting at the request of School District.  Only after participating in the June 2015 IEP meeting and touring the proposed Pickering Program did Parents decide that R.B. would attend VIP.  Once they made their decision, Parents timely notified School District and paid tuition to VIP before the start of the 2015-2016 school year.

Parents' early application to VIP was not unreasonable.  Parents applied early to VIP because, as VIP's website indicates, it is recommended that students "apply as early as possible because space is limited to 20-25 freshmen."  (District's Closing Brief, Ex. B.)  Application deadlines are imposed one to two months before the start of the school year.  (*Id.*)  Further, Parents' hiring of a private clinical psychologist for R.B. was not unreasonable.  Parents initially retained Dr. Powell-Mochler in late May or early June 2015 to deal with R.B.'s acting out issues with family, not to prepare R.B. for VIP.  (Powell-Mochler, N.T. 419, 421, 446.)  Parents' hiring of Dr. Cavaiuolo to evaluate the appropriateness of VIP was not unreasonable.  Parents were attempting to meaningfully contribute to the IEP development process by consulting with an expert in transition programming and sharing the expert's report with School District prior to the June 2015 IEP meeting.

Parents meaningfully participated in developing an IEP for the 2015-2016 school year and timely notified School District of their intention to enroll R.B. in VIP for the 2015-2016 school year.  Accordingly, Parents are entitled to reimbursement in full for tuition and related academic costs (training, books, and supplies) for the 2015-2016 school year.

2.      *The 2016-2017 school year*

We disagree with the Hearing Officer's conclusion that Parents did not meaningfully participate in developing an IEP for the 2016-2017 school year.  It was Parents who initiated the development of an IEP for R.B. for the 2016-2017 school year.  School District scheduled an IEP

meeting to discuss the 2016-2017 school year only after Parents contacted School District.  This is evident in the timing of the July 19, 2016 IEP meeting.  The year prior, the IEP meeting had been held six weeks earlier on June 1.

Further, Parents meaningfully participated in the development of the July 2016 IEP by asking Dr. Cavaiuolo to evaluate the Pickering Program.  Parents provided School District with Dr. Cavaiuolo's report in time for the July 2016 IEP meeting.

Parents also meaningfully participated in the development of the December 2016 IEP by permitting School District to re-evaluate R.B..  Parents made R.B. available all summer for the re-evaluation.  They should not be penalized for the School District's practice of not conducting re-evaluations during the summer.  Once R.B. returned to the VIP campus, R.B. was still available, by phone, to the school psychologist.  Parents should not be penalized for the school psychologist's failure to interview R.B. by phone.

The Parents' discussions with VIP representatives in the spring of 2016 about R.B. returning to VIP for a second year were not unreasonable.  Parents had not heard from the School District.  Parents did not know what program, if any, School District would offer R.B. for the 2016-2017 school year.  It was only reasonable for Parents to begin preparing for R.B.'s second year if School District could not provide a FAPE.

Moreover, it would have been unreasonable for Parents to remove their daughter from an appropriate private placement where she was thriving and place her in School District's proposed programs that would not have addressed her unique needs, interests, strengths, and potential.  Under all the circumstances, Parents' actions were reasonable.  Therefore, Parents are entitled to reimbursement in full for tuition and related academic costs (training, books, and supplies) for the 2016-2017 school year.

3.      *Residential and travel expenses*

A FAPE is composed of special education and related services.  Special education is "specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions."  20 U.S.C.A. § 1401(16).  Related services are "transportation, and such developmental corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a handicapped child to benefit from special education, and includes the early identification and assessment of handicapping conditions in children."  20 U.S.C.A. § 1401(17).

"If placement in a public or private residential program is necessary to provide special education and related services to a handicapped child, the program, including non-medical care and room and board, must be at no cost to the parents of the child."  45 C.F.R. § 121a.302.  A school district's reimbursement of the cost of residential placement is required when it is "necessary for educational purposes."  *Kruelle*, 642 F.2d at 693-94.  It is not required when the residential placement is "a response to medical, social or emotional problems that are segregable from the learning process."  *Id.*  If it is not realistically possible for us "to perform the Solomon-like task of separating" the child's "social, emotional, medical and educational problems," then, we must require the school district to reimburse parents for the cost of residential placement.  *Id.* at 694 (citation and internal quotation marks omitted).

Parents have requested reimbursement of residential and travel expenses.  Parents submitted a spreadsheet of costs associated with R.B. attending VIP.  (P-48.)  K.A. testified

before the Hearing Officer about how she computed travel expenses using MapQuest and EZ

Pass records and why she included the cost of hotels.  (Parents' Mot. at 23; K.A., N.T. 141.)

We disagree with the Hearing Officer's conclusion that it would be inequitable to require

School District to reimburse Parents for the cost of the residential component of VIP.  The

residential component was necessary for R.B. to receive a FAPE at VIP.  R.B.'s educational

needs are not segregable from her medical, emotional, or social needs.  R.B. had already been

exposed to independent living skills instruction in the classroom and application in a simulated

environment.  Due to the nature of her disabilities, for R.B. to make any meaningful progress in

this area, as opposed to *de minimis* progress, she needed to practice independent livings skills in

a natural environment with appropriate support.  *See M.C.*, 81 F.3d at 393 (affirming district

court's conclusion that child had "untapped potential" and finding that residential placement was

appropriate because child could no longer make meaningful progress in a day setting and the

residential setting allowed child to learn skills in their natural atmosphere.").  Moreover, living in

the residence hall was a requirement for R.B. to attend VIP.  Because VIP was an appropriate

placement for R.B., School District must reimburse Parents the cost of R.B.'s room and board at

the residence hall both school years.

We also disagree with the Hearing Officer's conclusion that it would be inequitable to

require School District to reimburse Parents for the travel expenses.  Transportation is a related

service contemplated by IDEA.  For example, School District provided R.B. transportation to

attend the MCIU career exploration program during the 2012-2013 school year and had offered

to provide R.B. with transportation to attend an ESY program in the summer of 2015.  Because

VIP was an appropriate placement for R.B., School District must reimburse Parents the costs of

mileage, tolls, and over-night stays at hotels incurred when Parents dropped off R.B. at VIP for

the start of a semester and when Parents picked her up at the end of a semester, both school years.  Although Parents commuted to and from VIP on other occasions to visit R.B. or to take her home for a weekend or holiday, those trips are not justified at public expense.

### E.   Attorneys' fees and costs of litigation

"The IDEA attorneys' fee provision, like various other statutory fee-shifting provisions, allows courts to award attorneys' fees to a 'prevailing party.'"  *M.R. v. Ridley Sch. Dist.*, 868 F.3d 218, 224 (3d Cir. 2017) (citing 20 U.S.C.A. § 1415(i)(3)(B)(i))).  "[F]or attorneys' fees purposes, [a party prevails] only if he obtains relief that is 'in some way merit[s]-based.'" *Id.*  (quoting *Raab*, 833 F.3d at 293)).  "[W]here the action enforces the parents' right to reimbursement or the child's right to compensatory education and the parents obtain backward-looking compensatory relief, the action requires an independent merits determination and the parents are eligible for a fee award."  *Id.* at 230 (citations omitted).

Under the IDEA, an award of attorneys' fees "shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished.  No bonus or multiplier may be used in calculating the fees awarded under this subsection."  20 U.S.C.A. § 1415(i)(3)(C).  In addition, although expert fees are not recoverable under the IDEA, *Arlington Cent. Sch. Dist. Bd. of Educ. v Murphy*, 548 U.S. 291, 297 (2006), they are recoverable under § 504 of the Rehabilitation Act, *A.W. v. Jersey Pub. Schs.*, 486 F.3d 791, 803-04 (3d Cir. 2007), and the ADA.  42 U.S.C.A. § 12205.

Both parties seek reimbursement of attorneys' fees and costs of litigation.  Any such determination requires additional briefing.  Parties shall submit memoranda on the reimbursement of attorneys' fees and costs of litigation within 45 days of the date of this Memorandum and Order.  A hearing will be scheduled if needed.

## IV.      CONCLUSION

For the foregoing reasons, School District's Motion for Summary Judgment will be denied and R.B. and Parents' Motion for Summary Judgment will be granted.  The parties shall submit additional briefing on attorneys' fees and costs of litigation.

Our holdings today are limited to R.B. As what is appropriate is particular to the unique needs, interests, strengths, and potential of the individual child, we are cognizant that VIP may not be an appropriate placement for children other than R.B. and that, likewise, the School District's proposed IEPs may have been appropriate for children other than R.B..

An appropriate order follows.

**BY THE COURT:**

*/s/ R. Barclay Surrick*
 **R. BARCLAY SURRICK, J.**